Mr. Hubachek. Mr. Chief Justice, and may it please the Court, in Wynne, the Court approved the imposition of a legitimation requirement only upon fathers of non-marital children born abroad. That was based on biological differences between men and women. It provided proof of parentage and proof of an opportunity to make a relationship   of non-marital children born abroad. In the case of the mother, the mother is a father and the father is the mother. In the case of the father, the mother has no biological basis. They set up barriers to the transmission of citizenship by younger fathers, but not younger mothers, and they're based upon gender stereotypes that women, not men, would carry – would care for non-marital children. That scheme has been tried. The Solicitor General's attempted to justify that scheme by claiming that Congress was concerned about statelessness, but the record doesn't support that claim. Both the 1935 Law Review article. Scalia. What separates a stereotype from a reality? Do you say it is not true that if there is a legitimate, illegitimate child, it is much more likely that the woman will end up caring for it than that the father will? That's not true? I think it is more likely, but I think that empirical evidence has not carried the day in gender discrimination cases. In all the cases, it is true in general, but there are people who don't fit the mold. That's – so a stereotype is true for maybe the majority of cases. It just means that you say this is the way women are, this is the way men are. Absolutely. And this is actually beyond just an empirical stereotype. At the congressional hearings, it was said that the woman is the sole legal parent of this child, totally excluding the man, which basically dates back to the notion of coverture, where men were completely out of the picture and women were the ones who were responsible. So in addition to the fact that the empirical portion of it, there is also just the notion that the legal parent was the woman. And that was specific to you. But wasn't that said in relation to the principle that only – that where paternity was not established, the child would be regarded as having the citizenship of the mother, under the law of virtually every country, if not every country, at that time? Well, under the law of many countries, that citizenship did go through the mother. But with respect to legitimation and this statute, Congress drew a distinction between all parents of – excuse me, all fathers of nonmarital children and those who legitimate. This statute applies only to those who legitimate. The very law review article that Congress relied upon, according to the Solicitor General, says that in the case of legitimation, citizenship goes through the father. So the bottom line is that the very article that they relied upon said that in one instance it goes through the mother, but in the instance of the people who are actually affected by this statute, those who legitimate, it goes through the father. And there were also a number of situations under which mothers – But until there's legitimation, it goes through the mother. It went through the mother under the law of virtually every country, right? I respectfully disagree. At the time, 1940, when this statute was passed, there were a number of situations where it wouldn't go through the mother. In China and Japan, if the father was merely known, it would not go through the mother. There were three dozen countries at this time, including the English countries and those who followed its law, in which if their female citizen gave birth to a child somewhere other than in their country, citizenship would not travel through that – that mother because of the laws of those particular countries. There were also stateless women. So in all of those situations, the citizenship would not go through the mother. It would have to go through the father. And this statutory scheme doesn't in any way provide for that. The scheme also creates severe risks of statelessness, as is set out in the Statelessness Scholars' brief, for married fathers. If a married father who is married to an alien, the – in those situations, there were a number of countries that would not allow the woman to transmit citizenship. So if the father was precluded by laws such as that were in the United States, that child would end up stateless as well. So there was substantial risk of statelessness. And it continues today. There are numerous countries that have basically reinstituted that rule that if the father is merely known, citizenship would not transmit through the mother. And those are primarily in the Middle East and some of them in Africa. And those are also detailed in the Statelessness Scholars' brief. Ginsburg. Mr. Yubachek, how do you deal with the argument that really this is a classification where the unmarried woman is being favored because the unmarried father is being bracketed with the married couples? So it's kind of like, what is it, Matthews v. Heckler, that the woman is getting a special favor and the unmarried father is treated like most people who marry couples who have children. This is not a case where Congress was seeking to remedy any sort of past discrimination against women, as was the case, say, in Schlesinger v. Ballard. There was no discrimination against women. Up until very shortly before the statute was passed, it was clear under the State Department practices that the children of non-marital children of women did get women's citizenship. And it was also true as to men. So there was no discrimination that was being remedied in that situation. But that doesn't answer, I don't think, Justice Ginsburg's question, which is this appears to be an exception to a generalized non-gender-based requirement. Couples, male or female, and fathers, unmarried fathers, are subject to 5 years. Only unmarried mothers get the largesse of 1 year. Why isn't why shouldn't everybody just be put to the broader category rather than a greater number of people? The reason is, Justice Sotomayor, is that we're not talking about an exception here, the treatment that the non-marital mothers were getting. That was the standard prior to the 1940 litigation, 1940 legislation. There was no significant residence requirement. Then Congress imposed new residence requirements because it was concerned about the foreign influence in mixed marriages, meaning someone who was married to an alien. In those situations, Congress specifically said in the record that they were concerned that when those children were born abroad, that they would have foreign influence, that they would be more foreign than they were American. But that's not. Sotomayor, isn't the 5-year residency requirement address that if we apply it generally? Wouldn't the 5-year residency requirement honor Congress's concern about there being a substantial tie to the States? Absolutely, it would. And that concern is not applicable when you're talking about two U.S. citizen parents to whom the extended residence requirement didn't apply, non-marital mothers who are assumed to be the ones who are going to be raising the children without the influence of an alien father. The non-marital fathers are in the same category as those two. Those non-marital fathers who raise their children on their own, as Petitioner's father did in this case, are not subject to that type of foreign influence. So they should be grouped together with the women and with the two citizen families because they have the lack of foreign influence. So it's only as to the mixed marriage couples who are married where there's a foreign influence problem and they're the ones to whom the expanded residence required. It was applied. Now, with respect to the — the Solicitor General has raised concerns about the plenary power doctrine, and I would argue that that doesn't apply here for a couple of reasons. First is we're not talking about the admission of aliens. Second is that the Court in Chod-Hahn's Ad Vitus has made clear that even when exercising that power, that congressional — excuse me, Congress's power is limited by constitutional limitations. Now, with respect to the entry of aliens, Congress made it very clear in passing this very statute that they considered those people who gained citizenship as of birth to be differently situated than aliens. That was a tradition that dated back to 1350. In 1790, Congress passed a statute saying that children born abroad to citizens of — Kennedy, are you taking us in the direction of an argument that Congress gets less deference in determining nationality than it does with admission to aliens? What I'm saying, Your Honor, is that we're talking about the ability of a United States citizen, Petitioner's father, to transmit citizenship, and that that is a traditional interest. Citizenship is extremely important, and it's a tradition that citizens have been able to do so for years. So, yes, constitutional limitations should apply when the — when Congress is drawing distinctions between men and women. Kennedy, so you want — you want us to write an opinion that says Congress has less deference when considering — when it determines who should be a national of this country than it — than when it determines who should be admitted as an alien? Well, there is no tradition dating back to 1350 for the admission of aliens. It's — Are you asking us to write that formulation in an opinion? Your Honor, what I'm saying is, is that the due process guarantee of equal protection is applicable in this context because the citizens of the United States — If I take that as a yes answer, what is your authority for that answer? It seems to me that it ought to be just the other way around. Well, Your Honor, my authority for that answer is the tradition that I've been discussing. Congress itself, in 1940, considered people who gained citizenship by birth abroad as being differently situated from aliens, aliens who naturalize. In fact, it said that it was universally understood. Well, of course, but it was Congress that makes the distinction. But you're asking us to say that Congress has less authority over this essential issue as to who should be nationals of the United States. Well, I think — That's a — maybe there's some authority for that. Do you have any authority? Is there something I can read that tells me that? Well, Chodhon's Advite has said that even though Congress has plenary power over the immigration power, when it exercises that power, it has to apply with constitutional limitations. This is the first one of the Court's cases where — Well, but that was an alien admissions case. You're talking about nationality. Right. I'm talking about citizenship being transmitted by a United States citizen. And what we're saying is, is that Petitioner's father, as a United States citizen, has equal protection, equal protection clause, protection against the discrimination here, because a similarly situated woman would be able to transmit citizenship. Wait, wait, wait. Sorry. Go ahead. I'm finished. Are you finished? Yes, Your Honor. I didn't quite follow this. As I understand it, I'm — what remedy will there be if you're right? This is what I don't understand. A child is born abroad. One parent is American. The other is foreign. If the two are married, that child is American only if the father or the mother, one or the other, has lived in the United States for now at least two years. It used to be more. Okay? Now it was five years after the age of 16. Now suppose they're not married, and suppose the American is the father. Same rule. Now suppose they're not married, and the American is the mother. Now it's not five years or two years. You only have to have lived here for one year. All right. Suppose I agree with you. I just don't see any sense to that whatsoever. I can't figure it out. They made a mistake about the immigration laws. Suppose I agree with you. Then why isn't the remedy, say, okay, whether it is the father or the mother? The general rule applies. They have to have lived in the United States for five years or for two years, now two years. There are a couple of reasons at least for that, Your Honor. First is that there's a structural limitation here to imposing a leveling-down type remedy, because citizenship cannot be taken away once it's granted. So the Court can't remedy the problem. All right. Some people were lucky, and they're already citizens under this. And there we are, because their mother lived in the United States for one year. Those already are citizens. Nobody is going to take that away. We're just looking at a statute. And in the first part of the statute, they have in section G of 1401 the first rule I told you about. In 1409A, the second rule. In 1409C, the third rule. So you say, okay, if you're right about this and it's totally unfair and there's no good reason whatsoever for distinguishing on the basis of gender, we strike G. Okay? Now, that would seem to be normal, but that isn't going to help your client. So how do you get to some other thing that instead of striking G, what we do is strike all of A and then strike the whole thing before and shove them all into G, which isn't so easy to do with this language. How do you get there? Well, the first thing is, is that this statute contains a severability clause, very similar to the other. So we strike G. What I'm worried about is you want me to strike A, sorry, we strike C, and you want me to strike 1409A and strike 1401G and shove the people who are there into G, which is a little tough to do in the English language. But I want to know how you get there. By extension, Your Honor. First, can you be clear about what you were saying? I thought your argument was you're not touching the married couples. That's correct. So that you're talking about equating the unmarried father to the unmarried mother. Do you have any notion of how many people we're talking about? I mean, in these extension versus invalidation, the court generally extends when there is a small class to be covered, the small class was left out, and a large class that's already covered. And the reasoning has been, well, my goodness, Congress wanted to take care of that larger class. It would be most destructive of the legislative will if we said you can't cover that larger class. So as the group of unmarried mothers, as against unmarried fathers, it's not a question Do you have any notion of what the numbers would be? Justice Ginsburg, I don't have any statistics to provide the Court. Maybe this is you'd like to answer Justice Breyer's question. Yes, Justice Breyer. Anyway, the remedy that we're requesting is extension. In Westcott and in Heckler, the Court looked at language in the severability clause that was similar to this, and also in Justice Harlan's concurring opinion in Welsh, and said that that type of language in a severability clause gives courts power to grant an extension remedy. So that's what we're requesting. We're requesting that. Now, there's another slight problem with that, I think. Reading this carefully, which I hope I've done, it seems to me it may also discriminate against fathers, and that's because C says that the woman has to have been physically present for a continuous period of one year. And I've read at least one article that says that word continuous doesn't appear with the fathers, and that they really mean it. That is, if somebody is living down in Texas and they happen to go visit on Christmas their father or their grandmother or cousin or something who is across the border for 5 minutes, that they cannot take advantage of this clause C. Is that true? I don't know the answer to that, Justice Breyer. I'll ask the SG that. But if it is true, if it is true, then I would think that the fathers are really worse off. Now, I don't know if that helps you. Maybe it could turn out that that's really a problem. If it is really a problem, then the fathers are worse off. Does that help you with the remedy? Chang, traditionally in immigration law, when you have continuous requirements, if it's a short trip, casual trip, then that requirement is not considered to have been violated. If the — if — I have to admit I'm having a hard time following the questions. Breyer, the question is I'm looking for a way. I'm trying to be helpful in my question. I'm looking for a way that you could get to your result. Now, I'm not saying I'd do it, but I just want to know what the best way is of getting to that result where you shove everyone into C instead of just cutting C. Well, the best way is to follow the course tradition in the benefits cases, such as Wengler and Wiesenfeld, where the Court granted an extension remedy and basically treated it. That would help you. Is there a reason for doing that? Well, the reason for doing that is, is that the language that's contained in the severability clause is similar to what the Court has already said allows an extension remedy. And the other problem is, is that if the Court doesn't grant an extension remedy, it leaves Petitioner basically without a remedy, that there will be individuals who enabled. But you could have a remedy. The remedy for an equal protection violation is to treat everybody the same. You can do that either by lowering the people who are given a benefit or by increasing the people who aren't. So he has a remedy. His objection is we're not being, my father and my mother are not being treated the same. That's all the relief he's entitled to. You're absolutely right that that is the state of the law. And my point is, is that structurally, that remedy is unavailable here because you can't take away the citizenship from the people who have already gotten it. And the notion that you can grant us prospective relief, as was discussed in Solicitor General's brief, doesn't make any sense either, because, number one, this statute doesn't, the one we're talking about today doesn't apply past people who were born before 1986. But the thing is, is if somebody were to come into court after an opinion that said just that were issued, someone were to come into court and say, I want to claim citizenship through my mother, that person would still be entitled to citizenship because it's as of the date of birth. So this is a retroactive provision. So the prospective relief notion really doesn't make any sense in this context because the equal protection violations have basically all already occurred at the time that the person who would make a citizenship claim was born. And we would still be left in a situation where Petitioner's father would say that I was unable to transmit citizenship to my son and a woman who was similarly situated was able to. So that type of remedy is unavailable. In the Court's decision in Iowa v. Bennett, the bank case, they actually ordered a refund of the taxes that were collected in a discriminatory manner dating back in time. So if you could factor out, if you could make a relief that would take away the benefit that others had received, then I would agree that that's available. That's not possible in this situation. Ginsburg. Mr. Ubichek, I think the Chief asked you, if it's an equal protection violation, then the Court just says it violates equal protection, but whether it goes up or down, the Court has to give a temporary solution because the legislature can't be convened on the spot. And the Court actually did go through that exercise, extension v. invalidation, most conspicuously in Califano-Westcott, in the Westcott case. It said, yes, that's what we've been doing in all these cases. In Sharon Frontiero's case, we didn't say, you've been discriminated against, Congress, you fix it. We said, you get the Court's allowance that up until now has been available only to male officers. In Weisenfeld, the father got the same child and care benefits as the mother. So the Court was making a decision for extension. It recognized it had to do that. Absolutely. And in many of the benefits case, the same analysis was available, and that's the analysis that we're asking that the Court apply here, but we're also making. Scalia, you are asking, I think, that the Court pronounce your client to be a United States citizen. Isn't that the only pronouncement from a court that is going to do your client any good? Well, Justice Scalia, unless he's a United States citizen. This is a criminal case, so technically what we're asking is for a reversal of the judgment and an opportunity to present this. A reversal of the judgment on the grounds that your client is a United States citizen, right? That it would be possible for him on these facts to become a United States citizen, yes. That he is a United States citizen. That he is. That he is. Do you have any other case where a court has conferred citizenship on someone who, under the statutes as written, does not have it? Well, that was one of the issues that was debated, of course, in the Wynn and Miller cases, and the Court has not said that yet. But it can in this case. You've never done it. That's correct. That's correct. But it can in this case for a number of reasons. Number one is the fact that this severability clause is applicable to this claim. Congress actually passed a statute, 1421d, in this same statutory scheme that said when we're talking about naturalization, the naturalization of aliens, then you cannot get naturalization under those circumstances any other way than what's set out in this statute. They didn't say that as to claims of citizenship as of birth. So there's a negative implication, basically, that they were not precluding this type of remedy as to a citizenship claim where we're claiming an equal protection violation. The second point is that if the Court is unable to grant that remedy, that would leave an equal protection violation in place. And as Justice Harlan made clear in Welsh Scalia, unless we solve the violation the other way, by saying that the father gets the shorter period that the mother has. Well, again, I'm sorry, that the mother gets the longer period that the father has. Right. And I think that the Court And you say we can't apply that retroactively. Well, okay. We don't apply it retroactively. The people that have citizenship cannot constitutionally be deprived of it. But for everybody else, it's okay. Even prospectively, Your Honor, because this statute says you have citizenship as of birth. So even if the Court were to render that decision and someone were to make a claim, they could still say I had citizenship as of birth, i.e., whenever I was born, which was before the Court's decision. So there really — that would be no remedy at all. It's a remedy. But any of the remedies that you're discussing with Justice Scalia involves this Court in a highly intrusive exercise of the congressional power. Let me just ask you this as an analytic matter or as a matter of logical priorities. We usually talk about substance first, remedy second. Do you think it's permissible, logically, for us to say that because the remedies here are so intrusive, that bears on our choice of whether or not we use intermediate or rational basis scrutiny, and because the remedies are so difficult, we're going to use rational basis scrutiny? Is that a logical way to proceed? I don't think so. I think the Court has traditionally said that the questions of a right and whether or not there exists an opportunity to make a claim and the remedy for it are analytically distinct. So I don't believe it. And it also said that the remedy can't be complicated because the Court's not set up to do that. I mean, that's what Westcott said. The Court can go one way or the other way. It can't do any fine-tuning because it's there as a temporary legislature. The ball goes back to Congress to do what it will, but it's just in the interim we need a solution. That's correct, and certainly Congress could do that. And the Solicitor General's brief makes clear that what was being balanced here was the concerns about, according to them, anyway, concerns about statelessness on the one hand and connection to the United States on the other. If Congress hadn't assumed, based on gender stereotypes, that men weren't caring for children, then it would have been able to put them in the same category as women, because they would understand that both of them would be caring for children. And it's not just the situation in 1940. As time has gone on, I believe in the National Women's Center brief, it points out that the number of men who are raising children in single-parent families has been increasing over time. So the problem, if anything, is getting worse. Ginsburg. But Congress did make at least some change, right? And this is no longer 5 years, it's only 2 years, right? The current system is 5 years, 2 years after the age of 16. I'm sorry, after the age of 14. And, of course, that age requirement here completely precluded Mr. Flores-Villar's father from being able to transmit citizenship because of his age. That kind of complete preclusion would never apply to a woman who is similarly situated. If the Court doesn't have any questions, I would like to ask Justice Sotomayor. Roberts. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. Congress, in deciding who among the various people born abroad should be made citizens of the United States, has to take into account myriad factors that may bear on that question and its judgment. They include, importantly, Congress's prediction in the case of conferring citizenship at birth, what will be that person's likely connection to the United States. Congress also has to consider the interaction with the laws of other countries where these people may be born. It may take into account equities, potential statelessness, or dual nationality. These are complicated questions to which the courts should defer. Now, in the particular- Sotomayor's intermediate scrutiny is not without some deference. Kneedler, unless we apply strict scrutiny, which no one is arguing for, the question is, is it rational basis deference or is it some intermediate scrutiny? Kneedler, Yes. And we believe that under this Court's decisions, and particularly Fiala v. Bell and the cases discussed in that case, that it should be rational basis scrutiny. Sotomayor, Well, but you can't really mean that, because we can put a hypothetical that's very simple, and then you'll explain to me why a U.S. citizen should be burdened in this way. And the hypothetical is, let's assume Congress determines that there are too many foreign-born children of U.S. citizens coming into the United States, and that those foreign-born children, those born of women, are placing a greater burden on our economic system. They need more care for reasons that Congress determines analytically or statistically. They're spending more money, more government money. And Congress passes a rule that says only the foreign-born children of men can come into the country, not of women. Wouldn't that be a rational basis? Kneedler, I think the answer to that question lies in the Court's formulation of the test that is applied in this particular context, and that is the formulation drawn from Kleindienst v. Mandel that was articulated in Fiala v. Pell, and that is that there has to be a facially legitimate and bona fide reason. I think that there is a facially legitimate reason. I think the Court could have no trouble concluding that an arbitrary choice between  Sotomayor, But this is not arbitrary. What other – what's arbitrary about a government saying, I want to spend less money on a new citizen than in my country? Kneedler, the ultimate reason may be legitimate, but I think the facially legitimate test also encompasses means, not just end. And if Congress is just arbitrarily choosing between men and women or people of different race, I think given this Court's tradition, it could conclude that those would be impermissible bases under the well-established test. But for the reasons we say in our brief, we don't Which is the well-established test? Fiala v. Pell, for the – and the cases underlying it. And we also think Is that the rational basis plus test you're talking about? You could call it that or you could call it the facially legitimate. Now we're going to just continue sort of tweaking the definitions and creating more variations on our review standards? I think it is a test that this Court has articulated in Fiala v. Pell and Kleindienst v. Mandel to address this very situation, including the situation where asserted constitutional rights of U.S. citizens in this country are being claimed. And we agree with Justice Kennedy that the standard should not be more demanding, but rather, if anything, should be less demanding, where the question is whether someone will be made a citizen. It's hard here because both the father – this father, but many fathers and mothers are actually U.S. citizens who want to bring their children over as U.S. citizens. So if the father was making the claim here, you would still argue it was a rational basis test, even though he's a U.S. citizen entitled to all the protections of the Constitution. We would argue for the facially legitimate test. Is that a claim? That was the case in Fiala, in which the plaintiffs included U.S. citizens, children and fathers, claiming that, in a very parallel situation, claiming that special privileges for illegitimate children to reunite with the mother worked in unconstitutional discrimination against the fathers of such children. And it was U.S. citizen fathers and children who were among the plaintiffs. And the Court nonetheless said that this is – there is no constitutional right to pass citizenship. This is a question of Congress's judgment about who it believes should be made citizens. And one of the important factors Congress has looked at is connection to a U.S. citizen. That is, in turn, a proxy for what the likely connection to the United States will be. Breyer, I understand that, but what you're doing is applying a lesser standard to gender discrimination than is ordinarily applied to gender discrimination. Now, is there any reason to do that? I think that was the thrust of the question. Well, but that was the issue. All right. Now, fine. If it's the government's position, you do. Does the same thing apply to racial discrimination? Again, I think the facial illegitimate standard in Fiala v. Bell would render a reliance on race. This suddenly is cutting a big hole in the 14th Amendment. No, I don't think so, because I think that same principle would be given effect in the way it's applied. First, in Fiala, we were dealing not with citizens. This is someone, a resident, it could be a resident alien, wanting to bring in a parent or a child. So it wasn't that case wasn't about who was the citizen at birth. It wasn't, but in the eyes of the Constitution, anyone born abroad is an alien unless and until Congress has passed a statute making them a citizen. So analytically, doctrinally, it is the same question, and the Court in Longmore has passed a statute making certain people citizens, and the question is, has it done so in a way that is compatible with equal protection? Ginsburg's question, but remind me, too, because it's not in the front of my head. I thought the classification that was dealt with in Fiala, wasn't it unwed parentage rather than gender? But the claim — there were claims based on both illegitimacy and gender, and there were equal protection claims based on both. But if I could move on to the way that the statute operates, because we think it satisfies either standard of review in this case, and if I could just step back for a moment. As I mentioned, there are a number of factors that Congress takes into account in crafting a statute like this. 1401 deals with married couples, and where both parents are citizens, all that is required is that one of the parents have resided in the United States prior to the birth. Where you have mixed parentage, the background of the enactment of this in 1940 and the reenactment in 1952 and continued up to this present day is Congress was concerned that such a child may not have the requisite connection to the United States, may have a connection to the parent, but may not have a connection to the United States, such that Congress wanted to grant citizenship to that person. So what Congress did in the mixed citizenship situation was to require prior residency of the parent as a talisman, as the Court said in Rogers v. Belli, for a connection to the United States of 10 years, 5 years after the age of 14. Congress has liberalized that, but that was the basic thought. Where you have unwed parents, in 1409a, what Congress did was to follow general principles of the law of illegitimacy or children born out of wedlock. If a father legitimates a child, then it is as if the child was born out of marriage — in a marriage, and the rule in 1401 with respect to marriage applies. That is true whether both parents are citizens or in a mixed marriage situation. If a father legitimates a child and both parents are citizens, then not the one — then the child benefits from the rule that if either parent was present in the United States before birth, is a citizen, doesn't have to satisfy the one-year unbroken residency requirement under 1409c. If it's mixed parentages and the father legitimates, then the rule applicable to married mixed citizen parents applies, and as if the child had been married at the outset. It's a perfectly sensible provision or approach, and consistent with the way this has been done. What Congress did with respect to the mother of a child born out of wedlock where there has not been — may not have been legitimation, is to confer citizenship on the basis of a one-year residency. Now, as Counsel for the Petitioner explains, a mother in that situation who, at the time this Court understood in Nguyen, that mother may be the only either legal parent or the only parent at the moment of birth with the requisite connection to the child to have an opportunity for the sort of connection at birth. So the mother in that circumstance is very much like the two-citizen parent family. The only parents are parents with a connection to the United States. Ginsburg. Mr. Kneedler, if the classification then were that we want to encourage, because it's good for society, father-child relationships, so we're going to give that advantage, that is, one year for fathers, and we're going to put the mothers together with the married couples, would that be compatible with equal protection? Kneedler, Well, I think that would be — that would depend upon a different rationale. I mean, here what Congress does is say, well, I told you what the rationale was. The rationale was we have lots of statutes nowadays like the Family Medical and Leave Act that attempt to encourage fathers to have a relationship with their children, to be an equal parent. So that's the rationale of this classification. They want to encourage the father-child relationship, therefore, they give this 1-year is enough for the father. And everything else is the same, except it's the father who gets the 1-year and the mother who gets the, what is it, 10 years and 5 years. Kneedler, I think that would be a more difficult question, because Congress would be responding based on the expected behaviors and talents, maybe, of men and women. What's different here is that's not what is — that's not the basis for this classification. This class— Ginsburg, it would be, in fact, acting on the basis of what hasn't been the general pattern, but what is becoming a new pattern. Kneedler, Right. And in that situation, Congress, I think, could be expected and maybe should be required to do that in a gender-neutral basis, because it is premising on the behavior. But what's— Ginsburg, so there is, even though we're still dealing with citizenship, you recognize that there are categorizations that would run afoul of equal protection. Kneedler, and the question would be whether that's a facially legitimate rationale. And I would want to know, I think I would want to know more about what the record for such a justification would be, et cetera. But I would like to— Ginsburg, the same is in the Family Medical Leave Act, making it a parental leave instead of, as it had been historically, a maternity leave. Kneedler, Right. And in that situation, I think it would be expanding on a gender-neutral basis rather than singling out one parent or the other. But I would like to finish the description that I have, because it's incomplete and there's a critical piece left out. And that is that counsel for Petitioner says that if a father legitimates an out-of-wedlock child, he is in the same position or that that child is in the same position as the child of an out-of-wedlock mother. And that is not likely to be so, and it's not likely to be so at birth, and this is the reason why, is when the child is legitimated, there are two parents who have the strong connection that was described in this Court's decision in Nguyen to that child, the U.S. citizen father, but also the mother, the alien mother in the other country. So you have two parents whose interests have to be taken into account, whereas in the situation Congress was addressing in 1409c, the situation of the child born out-of-wedlock where there was no, at the moment of birth, likely to be no recognized father, you have only the mother. And if we think of this in parallel to the illegitimacy case, the cases involving illegitimates that this Court has had in the domestic context, I think that's instructive. In a case like Lair, where the question was whether the father of a child born out-of-wedlock should have received notice of a prospective adoption, the Court explained in that case that the father has not taken the steps necessary to form the relationship with the child and, therefore, be a father in the eyes of the law, then the mother alone has to take the steps necessary. Breyer. And we have the briefs that are filled with, you know, pros and cons about the statelessness business and whether it was real. And I've read those and I'd like your comment on those, but I want to comment too on this very, what may be a very minor thing, but I did notice, prodded by an article, I have to say, that for the women there's a sense in which it's tougher. Yes. Breyer. And that's because of the continuous period. Now, I guess it depends on how that's enforced, but there could be a class of people, say, living in the border near Canada or near Mexico, where they just step across the border on Christmas Day to say hello to my cousin. And does that stop them from taking advantage of that? Is it, in other words, how is this enforced? Is it enforced with that rigidity? It does have to be continuous residence, and you are correct.  You can't go on Christmas. There may be very minor exceptions where you go across the border on Christmas Eve. That I can't think of. Is there or isn't there, to your knowledge, is this enforced with total rigidity or is it enforced that maybe you could go once a month or you could go on your birthday or what is the answer to that? I think in that situation, no. In the example that I was given. In that situation, you cannot go across the border? The example I was given when I asked this question was if you had somebody who's on, who lives in Mexico and commutes to the United States, what, you know, 5 days a week, you can, under 1401, you can add up each day and get to a total of 5 or 10 years of continuous, or excuse me, of actual physical presence. That would not satisfy the continuous. Breyer. So if it's tough, then, and really is meant to be tough, then there is a ration what is the rationale for treating women in this respect? Worse than treating men. Congress, the one-year provision is. The one year, I grant you the time one year is treating them better than the time 5 years. But the word continuous, if it's really tough is what your answer leads me to believe, and they really mean it. I mean, then that's treating them worse than treating the men. And I'd like to know what is the rationale for treating them worse. Congress selected some, because the, while I said the mothers are like the two-citizen family, or two-citizen parents in the sense that only U.S. citizens are the parent and you have some connection, Congress was balancing the duration of that connection, or taking into account the duration of that connection, and it chose to make it a little bit tougher. And I think that's perfectly legitimate, because Congress, because you only have one parent, and Congress was deciding, well, if somebody has been here for a continuous period of one year, then there is probably a greater likelihood that that person will have roots here than, for example, the other situation where if you had a child born abroad and came home in the summers, that child may not think of himself or may not be regarded as an American in the same way. So what Congress was doing was focusing on a period of longer duration, which in its judgment could give rise to, Congress believed, a greater connection to the United States. Roberts, if the Court were to determine that this does violate the Equal Protection Clause, and the Court were also to determine that this is not a case that should be the first one in history in which it grants naturalization, what do you think the Court ought to do? I think the Court ought to strike the eligibility of anyone to get citizenship on the basis of one year. I think it should constrict the class to those specifically governed by 1401. On the ground that it violates equal protection. And it's a solution. It is a remedy. And what about your friend's point that that retroactively deprives people of citizenship, that we would be saying they should have gotten if the Equal Protection Clause had been enforced? I think this Court could legitimately take into account the conferral of citizenship and the reliance on that. I think it's parallel to Heckler v. Matthews, where the Court upheld a statute in which Congress took account of reliance interests that had built up under the statute. Well, right. But here, of course, under my scenario, we don't have a situation where Congress has addressed the problem. So what do we do? If somebody who, under the theory that we say this person should not have been denied citizenship because of the unequal protection in the law, and he comes in, it's the same situation, he's going to be deported for not being an American citizen. And he says, I'm an American citizen. Does he get the benefit of that or not? No, I think he does not. I think the answer is that the — and partly for the reasons that you alluded to and Justice Scalia mentioned, we do not think that a court can properly grant U.S. citizenship and that that should enforce — excuse me, inform the remedy. But for the people who have been granted citizenship, I think the solution would be to invalidate the 1-year residency requirement. Scalia. Well, why would we grant that remedy when it doesn't do this Petitioner any good whatever? It's a remedy that doesn't remedy. Well, I suppose I could say that. It's granting relief that doesn't provide relief. And I suppose the Court could decide that at the outset, that it would not be appropriate to grant that relief and not go any further. The reason it doesn't grant that relief is somewhat unusual in this case. It only doesn't grant him relief because of the third party's standing. He doesn't care whether they're treated equally or not. He just wants to claim the benefit of citizenship. The person where he would get relief is if it were the father, because the relief that he's entitled to is to be treated equally. That's it. The relief this person is asking for is not to be deported. And so the problem of the relief being granted is really complicated by the fact that this is a case of third party standing. Right. I agree with that as well, which I think is all the more reason for the Court to be cautious about entering into this. I think that's what I'm saying. Mr. Kneedler, in answering the question that way, I know you're familiar with the Weisenfeld case. And the question was, this was a father who was denied benefits to take care of a child whose mother died in childbirth. And the Court came out with a unanimous judgment, but it split three ways on why. And one of the members of the Court said, this is discrimination against the child even though the classification was, it's called a mother's benefit, it's discrimination against the child because it should make no difference at all whether the missing parent is female or male, that that was utterly irrational. That was then Justice Rehnquist's concurring opinion in Weisenfeld. So he seems to think that the discrimination was against the child and that that was intended for equal protection purposes. Kneedler, Well, here the only claim that has been raised is an equal protection violation of the parent's certain rights. Ginsburg, Well, that's what Stephen Weisenfeld, the father, was the plaintiff. But the Court's, at least one justice's rationale was that the discrimination is really against the child, but the father can raise it. Kneedler, Well, insofar as any claim of discrimination by the child, I think since it's not based on the child's gender, I think that would clearly be a rational basis or a facially legitimate standard. And Justice O'Connor's opinion in Miller v. Albright addressed the rational basis there. And here this is not just based on the gender of the parent, it's based on the complexities in the legal history with respect to illegitimacy and how children born out of wedlock are dealt with, which again turns not on stereotypes about behavior or talents, but on longstanding legal regimes, not just in this country, but in other countries, that until the father does something to have a meaningful relationship, the mother is the only legal parent or, in the terminology of this Court's decision in Nguyen, the parent who is likely to have the meaningful relationship. Once the father comes forward in a case like Lair, the result is not that the father gets a veto power or that only the father's interests are taken into account. The answer is that you have two parents who present as if they could. Ginsburg-Miller That's a case where mother versus father. But here it's a single parent. This is not a case where the father is doing something that the mother regards as disadvantageous. That was in the Lair case. And you said something about this has nothing to do with stereotypes. This is the way the law was, but wasn't the law shaped? Because of the vision of the world of being divided into married couples, where the father is what counted, and unwed mothers, where she was, they said, both father and mother, because the law didn't regard him as having any kind of obligation? Kneedler Again, I think this is the issue the Court addressed in Nguyen, in which the Court said that there is a difference at the moment of birth in the potential and, therefore, the likelihood of a connection of child to parent. At the moment of birth, that justified the requirement that the father take a step to legitimate the child in order to be able to be on an equal footing with the mother with respect to the rights. And here, the residency requirement is what measures the connection of the parent to the United States, not the child to the parent. But we think the same point obtains, that at the moment of birth, in another country, for example, another country might take the same view that this Court took in Nguyen and Laird in cases like that, that the father does not have a meaningful connection to the child in the sense that one would predict citizenship on the basis of, until there had been some formal steps, which would happen after birth, to establish the relationship with the child. If it was constitutional for Congress to do that in Nguyen, it's constitutional for Congress to take into account that other countries might do the very same thing. Ginsburg. But, Nguyen, I thought that the Court relied on the biological factor, which is not so here. I mean, here's no question that this is the natural parent of the child. Well, yes, but in Nguyen, the Court did not look at the circumstances of the particular case. It looked generally to what would have justified Congress's acting categorically, as we think Congress has to have the flexibility to do. And I think the questions in these statutory provisions show that there are numerous competing equities and considerations that have to be taken into account. And that is what Congress did here with respect to establishing the — requiring a close nexus to the United States. And if in another country a father has legitimated or done those steps, then you have a U.S. citizen mother and a father in another country that is directly parallel to the married mixed parent marriage. And Congress was concerned about whether that child was going to be sufficiently affiliated with the United States to justify a conferral of citizenship. Roberts Counsel, if we determine that the only remedy we can impose is to equalize up, in other words, add to the burden on the mother rather than relieving the father of it, do you have authority for the proposition that we can address that issue hypothetically, in other words, without making a decision on the equal protection question on the merits? In other words, look ahead, and if you say, look, the only remedy we're going to be benefit him regardless of how the merits are decided, therefore, we don't reach the merits. I don't have authority from a decision in this Court. I may be not recalling something. I don't. But I do believe in the special context of citizenship that there might be a justification for the courts doing that. Well, that would be in effect saying that we have no jurisdiction, because there's no standing, because there's no remediation that the Court can make. I suppose that would be one way of looking at it. I mean, the Court traditionally has looked at questions of severability as a question of remedy and not at the outset. But this is, to be sure, a very peculiar situation. And I should also point out. Ginsburg Mr. Kneedler, in answer to the Chief's question, do you know, I mean, there have been a number of cases raising this extension versus nullification. And in every one of them, the Court did make a choice. It didn't say, well, we can't make any choice. In the one, was it Matthews v. Heckler? Kneedler Yes. Ginsburg The Court did make a choice, and it was the rare case where the Court equalized down. But I don't know any one of them. Kneedler No, I think that is ordinarily the case, but this is a difficult context. And just to go back with a complication from the remedial approach that Chief Justice suggested, if the Court declared an expansion of citizenship, and if that was held to apply to everybody similarly situated rather than just the Petitioner in this case, it would raise questions about whether Congress would have the freedom, after such a declaration of a perhaps dramatic expansion of citizenship under the prior law, to remedy that with respect to people who, for the following this Court's decision, at least the logic of the Court's decision would suggest that they were citizens, too. Breyer Is there anything rings a bell in this, in your mind? I mean, the thing that goes the other way is the right of an American citizen to pass his American citizenship on to his children. And when we talk about Congress's power over naturalization, is there anything that's drawn a distinction between the general power, which are people who are not citizens to become citizens, but what it seems to me intuitively is a different situation, of the right to pass your citizenship on? Does that ring any bell at all? Kneedler There is no such right. And Wong, the Court's decision to pass your citizenship on to your children is a different situation. Well, the Court's decision in the dissenters in Nguyen discussed this, but we think it's clear that under this, under Wong-Kim Mark and Rogers v. Belli, that that is equally an exercise of Congress's naturalization power, which is subject to the same plenary standards. Breyer Just looking, just looking, trying to get your memory to, can you, does something come to mind the opposite way, that where the Court did go into a long exegesis about the law, including constitutional law, and then says at the end, well, but you're not entitled to memory, to a remedy because of some other experience? Kneedler This is going back to remedy. I don't, I don't, I don't specifically. Roberts Thank you, counsel. Mr. Hubachek, you have 4 minutes remaining. Hubachek Thank you, Mr. Chief Justice. The rationale that the Solicitor General's office offers today is that further assumptions can be made that even after men do the things that the Court said were legitimately required of them, that they legitimate, that they have an opportunity to form a relationship with their child, that further gender-based assumptions should be put into place and say that, well, but you're not going to be the real father or you're not going to be the real parent. Whereas in women, in the case of women, we're going to assume that when they have the non-marital child, they are going to be in charge, and that when a father legitimates and does whatever is required in wherever the child was born, we're going to assume that the mother is involved still. But the very facts of this case demonstrate that that's not the case, that in this case Petitioner's father raised him and Petitioner's mother was not involved in his growing up, and he brought him to the United States. I'm sorry, I thought I was getting a question. So it's basically piling further gender-related inferences on top of the ones that are already in place in order to serve to justify this distinction. Now, with respect to the Fialo case, there is a tradition of allowing citizens to transmit citizenship. Fialo involved getting aliens into the United States. There's no tradition that dates back to 1350 where citizens have enjoyed rights to bring aliens into the United States, but it does date back to 1350 that you've been able to confer citizenship on your foreign-born children. So it is differently situated. And it's differently situated in the very structure of the statute that we're talking about today. Congress very specifically eliminated the ability of courts to change the rules of naturalization of aliens. It basically used language very similar to the Court's decision in Ginsburg and said that you can be naturalized under this provision and no other way. It didn't say that as to citizens as of birth. Citizens as of birth are treated differently. There's a severability clause in the statute, so that would apply to them, and that brings into play all of the various remedies that the Court has granted with respect to extension over the years. Roberts. Roberts. You refer to the tradition of passing you agree with Mr. Kneedler that there's no such right? I agree that the Constitution doesn't guarantee that right. Our point is, is that it's a traditional right and Congress has always provided for it. Even in the period between 1802 and 1855 where the statute was strangely drafted and didn't provide for it, this Court made clear in Montana v. Kennedy that when Congress remedied that situation, it made that remedy retroactive. So basically, we have an unbroken tradition dating back to 1350. That's why I think that this right should be treated differently than the questions of admissions of aliens in Fialo. And again, there's also Chod-Hod's Advaitis that make clear that the Constitution limits the Congress's power even in the context of naturalization. And with respect to the third-party standing issue, the Court has granted a third-party standing to criminal defendants who are raising third-party constitutional issues in their criminal cases, and the same analysis should apply here. We can still look at the right from the perspective of Petitioner's father, and if the Court were to remedy, that would not remedy the situation that Petitioner's father would be in, because both before and after the Court's decision, the children of women, similarly situated women, would be citizens, and Petitioner's father's son would not. What were the criminal cases where there was a – where the defendant was permitted to raise? Campbell and Powers. Those are both cases where the criminal defendant asserted rights of – in one case it's a pettit juror, and in the other case it was a grand juror. And those – there were discriminatory, preemptory challenges in those cases and other issues, and the Court allowed those criminal defendants to assert those constitutional rights. Seven members of the Court also found that they were standing in Miller. Kowalski pointed out, and I think Craig v. Boren, that there's a very forgiving standard when third-party's rights are at issue in a case. Roberts. Thank you, counsel. Counsel, the case is submitted. The Honorable Court is now adjourned until Monday next at 10 o'clock.